## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PRESTIGE CAPITAL FINANCE LLC,

      **Plaintiff,**

      **v.**

CVS PHARMACY, INC., BOOMER
NATURALS INC., BOOMER
NATURALS HOLDINGS INC.,
MICHAEL R. QUAID, and DANIEL J.
CAPRI,

      **Defendants.**

Civ. No. 22-735 (KM) (LDW)

**OPINION**

__KEVIN MCNULTY, U.S.D.J.:__

    Now before the Court is the motion of Defendant CVS Pharmacy, Inc. ("CVS") to dismiss the Complaint. (DE 21.)[1] For the reasons set forth below, CVS's motion to dismiss is **DENIED** as to Counts Three, Four, Five, Six, Seven, and Ten, and **GRANTED** as to Count Eight.

## I.   BACKGROUND

    Plaintiff Prestige Capital Finance, LLC ("Prestige") is a company that specializes in factoring, which generally involves purchasing accounts receivable from other businesses for ready cash, at an agreed discount. (Compl.

---

[1]    Citations to the record will be abbreviated as follows:

    "DE" = Docket entry number in this case

    "Compl." = Plaintiff's Complaint (DE 1-3)

    "Br." = CVS's Brief in Support of Motion to Dismiss (DE 21-6)

    "Opp." = Plaintiff's Brief in Opposition to CVS's Motion to Dismiss (DE 25)

    "Reply" = CVS's Reply Brief in Further Support of Motion to Dismiss (DE 33)

¶ 16.) Prestige is then entitled to collect on and enforce the outstanding accounts. (*Id.*)

Defendant Boomer Naturals Inc. ("BNI") is a corporation that sells medical face masks.[2] (*Id.* ¶ 28.) On or about June 4, 2020, BNI and CVS entered into an agreement, wherein CVS granted BNI the right to manufacture masks bearing the marks of CVS and some of its affiliates (the "Store Brand Agreement"). (*Id.* ¶ 29.) In order to obtain cash flow to fund its business relationship with CVS, BNI entered into a factoring relationship with Prestige on or about June 24, 2020. (*Id.* ¶¶ 17, 27.) Then, on July 8, 2020, BNI executed CVS's standard-form purchase order agreement (the "Purchase Order Agreement") and began to supply CVS with face masks for internal use and for resale in CVS stores and online. (*Id.* ¶¶ 30, 32.)

The next day, on July 9, 2020, CVS received notice of the factoring relationship between Prestige and BNI and was instructed to make all payments directly to Prestige. (*Id.* ¶ 33.) In response, CVS worked with BNI and Prestige to establish Prestige as a vendor and payee in CVS's system. (*Id.* ¶ 34.) By August 12, 2020, Prestige was authorized to receive direct payments from CVS and access CVS's online vendor portal. (*Id.* ¶ 35.) The online vendor portal displayed all information related to the status of CVS's accounts payable to BNI. Prestige reviewed that information when determining whether to purchase additional accounts receivable from BNI. (*Id.* ¶¶ 36–37.)

The tripartite relationship between Prestige, BNI, and CVS continued for about a year, during which CVS made over $32 million in direct payments to Prestige. (*Id.* ¶ 38.)

In mid-May 2021, BNI requested additional funding from Prestige related to a face mask sale to CVS. (*Id.* ¶ 39.) On May 17, 2021, Prestige accessed the

---

[2]    Defendants BNI, Boomer Naturals Holdings Inc., Michael R. Quaid, and Daniel J. Capri (the "Boomer Defendants") do not join in CVS's motion to dismiss. The Boomer Defendants filed an answer to the Complaint on May 9, 2022, along with crossclaims against CVS. (DE 32.) On August 19, 2022, I entered the joint stipulation of dismissal of the Boomer Defendants' crossclaims. (DE 53.)

online vendor portal. (*Id.*) The portal showed a total due from CVS of over $3.7 million, minus discounts and holdbacks of about $75,000, with invoice dates between April and May 2021 and payment dates between May and June 2021. (*Id.* ¶¶ 39–40.) Additionally, the invoices were marked "Free for payment," meaning "the amounts reflected had been approved for payment without further chargeback, holdback, credit or setoff." (*Id.* ¶¶ 39–41.) In reliance upon that information, on May 18, 2021, Prestige purchased over $1.7 million of BNI's receivables. (*Id.* ¶¶ 42–43.) Prestige made additional purchases between May 20 and June 4, 2021, bringing BNI's total cash advance to over $3.5 million. (*Id.*)

Prestige accessed the online vendor portal additional times on June 3, 2021, June 7, 2021, and June 28, 2021. (*Id.* ¶¶ 45, 48, 51.) The information on the portal generally showed a total due from CVS of over $3 million, minus discounts and holdbacks between $65,000 and $73,000, with invoice dates between April and June 2021. (*Id.* ¶¶ 45–46, 48–49, 51–52.) All invoices were marked as "Free for payment," and payments were due between June and August 2021. (*Id.* ¶¶ 46–47, 49–50, 52–53.)

Then, on July 6, 2021, Prestige accessed the online vendor portal and discovered that the recorded balance now due from CVS stood at only about $280,000, minus discounts and holdbacks of about $72,000. (*Id.* ¶ 55.) The portal showed that, on July 1, 2021, CVS issued credits to itself aggregating over $3.23 million. (*Id.* ¶¶ 56–57.) When Prestige inquired into the credits, CVS provided seemingly conflicting explanations. (*Id.* ¶¶ 57, 59.) CVS, in the first instance, explained that the credits were issued because the masks supplied by BNI in May 2021 were not actually ordered by CVS and were shipped without authorization. (*Id.* ¶ 58.) At the same time, however, CVS stated that it had discounted the amount due based on "seasonal discount" credits it was owed related to holiday promotions, such as "Thanksgiving, Christmas, and New Year's 2020". (*Id.* ¶ 59.)

CVS has not paid Prestige the $3.23 million previously reflected on the online vendor portal, but thereafter erased by the July 1, 2021 credit. (*Id.* ¶ 60.) BNI, in turn, has not paid Prestige the remaining balance of the cash advance, totaling about $3.5 million. (*Id.* ¶ 61.)

Prestige initiated this action in state court on January 13, 2022, and CVS removed it to this federal court on February 10, 2022. (DE 1.) The Complaint asserts two counts against the Boomer Defendants: breach of contract (Count One) and breach of the implied covenant of good faith and fair dealing (Count Two). It asserts six counts against CVS: breach of contract (Count Three), breach of the implied covenant of good faith and fair dealing (Count Four), fraud (Count Five), negligent misrepresentation (Count Six), promissory estoppel (Count Seven), and tortious interference (Count Eight); and two counts against all Defendants: book account/account stated (Count Nine) and quantum meruit/unjust enrichment (Count Ten).

CVS filed the current motion to dismiss the Complaint on March 17, 2022. (DE 21.) Prestige filed its opposition to the motion to dismiss on April 18, 2022 (DE 25), to which CVS replied on May 9, 2022 (DE 33). The motion is now ripe for decision.

## II.   STANDARD OF REVIEW

### A. Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). On such a motion, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to plead "a short and plain statement of the claim showing that the pleader is entitled to relief"). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is "plausible on its face." *See Twombly*, 550 U.S. at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). This entails "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.* Stated differently, in reviewing the well-pleaded factual allegations and assuming their veracity, this Court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

## B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement, over and above that of Rule 8(a). Specifically, it requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.* That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted). In general, "[t]o satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.*

> [Plaintiffs] need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their

allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.

*Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (internal citations omitted) (quoting *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984) and citing *Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 99 (3d Cir. 1983)).

## III.   DISCUSSION

### A. Consideration of Documents Outside the Complaint

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. Mar. 31, 2022) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Where a document, however, is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment" under Federal Rule of Civil Procedure 56. *Id.* (quoting *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020)). For a court to consider such a document, however, that document must be "undisputedly authentic." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Federal Rule of Civil Procedure 12(d) provides an alternative procedure in a case, like this one, in which a defendant who moves to dismiss also submits exhibits and evidence extrinsic to the pleadings:

(d) Result of Presenting Matters Outside the Pleadings. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). *See also In re Asbestos Products Liability Litigation (No. VI) (ex rel. Hassell)*, 822 F.3d 125, 134 (3d Cir. May 16, 2016). One option, then, is

simply to disregard extrinsic material not properly considered on a Rule 12(b)(6) motion, and treat the matter as an ordinary motion to dismiss. The other is to treat the motion as one for summary judgment under Rule 12(d). If the court does so, "it must provide the parties 'reasonable opportunity' to present all material relevant to a summary judgment motion." *In re Rockefeller Center Properties, Inc. Secs. Litig.*, 184 F.3d 280, 287-88 (3d Cir. 1999) (quoting Fed. R. Civ. P. 12(d)).

Here, the Complaint explicitly refers to and rests upon two agreements: the Store Brand Agreement (Compl. ¶ 29) and the Purchase Order Agreement (*Id.* ¶ 30). Defendant attached the Store Brand Agreement to its motion to dismiss (Br. Ex. A, 21-2) and Prestige attached the Purchase Order Agreement to its opposition brief (Opp. Ex. B, 25-3). No party disputes the authenticity of those documents or denies that they are the agreements explicitly relied on in the Complaint. Therefore, I may consider the Store Brand Agreement and Purchase Order Agreement.

CVS, however, attached a third document to its motion to dismiss that is not mentioned in the Complaint: the "Terms of Use Agreement" between itself and BNI, which governs BNI's use of the online vendor portal. (Br. Ex. B, 21-3.) CVS asserts that, with regard to this agreement, Prestige as assignee steps into the shoes of BNI and is bound by certain disclaimers in the Terms of Use Agreement. (Reply p. 3.) Specifically, CVS asks the Court to dismiss Counts Five (fraud), Six (negligent misrepresentation), and Seven (promissory estoppel) based on the Terms of Use Agreement. (Br. pp. 12–13, 17, 27–28.) Prestige, however, asserts that it is not bound by the Terms of Use Agreement because it did not sign that agreement and its right to payment derives only from the Purchase Order Agreement. (Opp. 12–13.)

CVS has asked the Court to consider the Terms of Use Agreement in an attempt to factually and legally rebut the allegations of the Complaint. However, the Complaint does not mention the Terms of Use Agreement and Prestige disputes its applicability. I find that the Terms of Use Agreement is not integral to the Complaint and is not so uncontroversial that it may be

7

shoehorned into the case at the motion to dismiss stage. Rather, it is properly asserted as a matter of defense. I therefore will not dismiss Counts Five, Six, or Seven on this basis. Defendants may, if appropriate, renew their contentions at the proper time, *e.g.*, in their answer and via a motion for summary judgment.

### B. Breach of Contract

Count Three of the Complaint asserts a claim for breach of contract against CVS. (Compl. ¶¶ 75–79.) CVS argues that Prestige cannot sue for breach of contract because the Store Brand Agreement contains an anti-assignment provision that prevented BNI from assigning its right to payment without the prior written consent of CVS. (Br. p. 12.) According to CVS, Prestige fails to allege that it received CVS's written consent prior to the assignment of BNI's right to payment; therefore, the breach of contract claim must be dismissed. (*Id.*) Prestige responds that the Purchase Order Agreement, and not the Store Brand Agreement, governs the assignment of payment from BNI to Prestige. (Opp. p. 9.) Therefore, the Store Brand Agreement's anti-assignment provision does not apply. (*Id.*)

"Where a contract uses specific and express language sufficiently manifesting an intention to prohibit the power of assignment without the consent of one or more of the contracting parties, courts generally uphold these contractual anti-assignment clauses."[3] *Somerset Orthopedic Assocs., P.A. v. Horizon Blue Cross & Blue Shield N.J.*, 785 A.2d 457, 460 (N.J. Super. Ct. App. Div. 2001) (citation omitted) (holding that the anti-assignment clause was valid and enforceable to prevent assignment).

The Store Brand Agreement grants BNI the right to manufacture and label certain products for CVS and describes the requirements related to that manufacturing and labeling. For example, the Store Brand Agreement provides

---

[3]     CVS states that the Store Brand Agreement is governed by Rhode Island law. (Br. p. 11 n.3.) However, CVS cites to both New Jersey and Rhode Island cases, and asserts that the parties may restrict assignability of contractual rights regardless of which state's law applies. (*Id.* p. 11.) The parties do not raise a choice-of-law dispute, and I find that deciding the issue is not necessary for purposes of this discussion.

specifications for packaging, production conditions, minimum stock, and quality of the products. The Store Brand Agreement further grants BNI the right to use the CVS trademark when preparing and packaging certain products. Additionally, the Store Brand Agreement contains an anti-assignment provision:

> Neither this Agreement nor any of the rights or obligations of the parties thereunder shall be assigned or transferred by [BNI] without the prior written consent of CVS.

The Store Brand Agreement was fully executed by BNI and CVS on June 5, 2020. (Br. Ex. A, DE 21-2.)

BNI and CVS subsequently entered into the Purchase Order Agreement on July 8, 2020. In the Purchase Order Agreement, BNI agrees to sell products to CVS, and CVS agrees to purchase those products from BNI. The Purchase Order Agreement states that CVS's offer to purchase products from BNI is "expressly subject to [BNI's] acceptance of the terms and conditions of this Agreement." The Purchase Order Agreement describes the financial requirements, such as the information that BNI must include in its invoices and CVS's obligation to pay those invoices. The Purchase Order Agreement also addresses the taxes to be collected by BNI from CVS. Attached as Exhibit A to the Purchase Order Agreement is a "Services and/or Pricing Sheet," which includes an estimated order of face masks and price.

The Purchase Order Agreement states that it "supersedes all prior written or oral agreements with respect to the subject matter in this Agreement." The Purchase Order Agreement also contains a provision barring certain assignments without prior written permission:

> [BNI] shall not assign, subcontract, or otherwise transfer its rights or obligations under this Agreement except with the prior written consent of CVS. Any attempted assignment not assented to in the manner as prescribed herein, except an assignment confined solely to monies due or to become due, shall be void.

(Opp. Ex. B, DE 25-3.)

Having reviewed the Store Brand Agreement and the Purchase Order Agreement, I am unpersuaded by CVS's argument that Prestige cannot maintain a breach of contract claim because the anti-assignment provision found in the Store Brand Agreement invalidates BNI's assignment of payment to Prestige. I recognize that both the Store Brand Agreement and the Purchase Order Agreement affect the underlying business relationship between CVS and BNI. (*See* Reply p. 1, citing Compl. ¶¶ 29, 32.) However, these are two separately executed agreements addressing different aspects of that relationship: one related to the manufacturing of products and one related to the purchase and sale of products. BNI assigned to Prestige the right to payment for the sale of products, which appears to be governed by the Purchase Order Agreement. The Purchase Order Agreement, unlike the Store Brand Agreement, contains an express offer to purchase goods in exchange for payment and describes the conditions applicable to the same. Furthermore, the Purchase Order Agreement, which was executed *after* the Store Brand Agreement, states that it "supersedes all prior written or oral agreements with respect to the subject matter in this Agreement."

The parties also dispute whether the anti-assignment provision in the Purchase Order Agreement invalidates the assignment. Prestige asserts that it does not. According to Prestige, it fits within the anti-assignment provision's exception for "an assignment confined solely to monies due or to become due" because BNI assigned to it only the right to payment. (Opp. p. 9.) Therefore, there was no obligation for BNI or Prestige to obtain CVS's prior written approval for the assignment. (*Id.*) In its reply brief, CVS asserts for the first time that Prestige does not fit within that exception because it "seeks the full amount of the receivables it purchased from Boomer even though those amounts have been offset to account for masks that were shipped by Boomer without authorization and 'seasonal discount' credits that were never applied." (Reply p. 2.) CVS also states in its reply brief that it did not provide written consent to the assignment as required by the terms of the Purchase Order Agreement. (*Id.*) CVS does not provide any further explanation of its position.

10

To the extent CVS seeks to dismiss the breach of contract claim based on the assignment provision found in the Purchase Order Agreement, that argument is raised for the first time in its reply brief and I decline to consider it. *See Gap Props., LLC v. Cairo*, Civ. No. 19-20117, 2020 WL 7183509, at *8 (D.N.J. Sept. 17, 2020). At any rate, consideration of CVS's belated contentions would raise factual issues (*e.g.*, regarding the circumstances surrounding delivery of the face masks, or the validity of the discounts applied to the accounts receivable) that are obviously not suitable for resolution on a motion to dismiss. (*See*, *e.g.*, Compl. ¶¶ 57–60.)

The cases that CVS cites do not alter my conclusion. In *Li v. BMW of North America, LLC*, the anti-assignment provision stated that the plaintiff had "no right to assign any of [her] rights under" the contract, without any exception. No. A-0453-15T3, 2017 WL 2625965, at *1 (N.J. Super. Ct. App. Div. June 19, 2017). Here, however, the Purchase Order Agreement includes an exception, which Prestige asserts it can satisfy. Additionally, in *Davis v. JT Building and Development LLC*, the anti-assignment provision at issue required the tenant to obtain the landlord's written consent prior to any assignment, with one exception that the tenant was able to satisfy. No. PB07-4683, 2010 WL 4551605, at *8 (R.I. Super. Ct. Nov. 5, 2010). By satisfying that exception, the landlord's consent could only be withheld until it had "reasonably satisfied" itself with the financial stability of the assignee. *Id.* The landlord refused to consent to the assignment, and the tenant sued. The court ultimately concluded that "the Landlord unreasonably withheld consent to the assignment." *Id.* at *11. Whether CVS unreasonably withheld its consent to the assignment is not at issue in this case.

Whatever the merits of CVS's contentions, they cannot be resolved at this procedural stage. CVS's motion to dismiss Count Three of the Complaint is denied.

### C. Economic Loss Doctrine

CVS argues that the Court should dismiss Prestige's claims of breach of the implied covenant of good faith and fair dealing (Count Four), fraud (Count Five), negligent misrepresentation (Count Six), and tortious interference (Count Eight) under the economic loss doctrine because the alleged wrongdoing for each of those claims is predicated on the same underlying facts as Prestige's breach of contract claim. (Br. pp. 26-27.)

Under New Jersey law, the economic loss doctrine bars plaintiffs from "recovering in tort economic losses to which their entitlement only flows from a contract." *Chen v. HD Dimension Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010). "Only tort claims asserting the defendant breached a duty owed to the plaintiff independent of the contractual duties may be alleged alongside a breach of contract claim." *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 462 (D.N.J. 2020).

At some point, Prestige may be barred from simultaneously pursuing its tort and contract claims. At the motion to dismiss stage, however, I will generally respect a party's entitlement to plead claims in the alternative, and will not require it to elect one theory or the other. *See* Fed. R. Civ. P. 8(d). *See Sahoury v. Meredith Corp.*, No. 11-cv-5180, 2012 WL 3185964, *8 (D.N.J. Aug. 2, 2012) ("The economic loss doctrine, if applicable here, would bar *recovery* where tort and fraud claims arise from the same facts as a breach of contract claim. It does not bar a plaintiff from pleading such claims."). Therefore, I decline to dismiss Counts Four, Five, Six and Eight under the economic loss doctrine.

### D. Quasi-Contract Claims

Similarly, CVS asserts that the Court should dismiss Prestige's quasi-contract claims of promissory estoppel (Count Seven) and quantum meruit/unjust enrichment (Count Ten)[4] because the alleged wrongdoing for

---

[4]    In its briefing, CVS refers to the claim for "quantum meruit/unjust enrichment" as Count Nine rather than Count Ten. (Br. 29.) Count Nine of the Complaint asserts a

each of those claims is predicated on the same underlying facts as Prestige's breach of contract claim. (Br. p. 29.)

Unjust enrichment and promissory estoppel are causes of action commonly pled in the alternative to breach of contract. *See Mendonca & Partners, LLC v. Prakash Baskaran, Pawaa, Inc.*, No. 16-cv-639, 2016 WL 3769749, at *3 (D.N.J. July 13, 2016). As stated above, at this stage, pleading in the alternative is permissible. *See* Fed. R. Civ. P. 8(d). I note that Prestige is claiming it is owed money for goods actually delivered to CVS but not paid for. I take no position as to the underlying facts, but at this early stage, I cannot find that pleading these theories is inappropriate. Accordingly, I decline to dismiss Counts Seven and Ten.

### E. Fraud

Count Five of the Complaint alleges a claim of fraud against CVS. (Compl. ¶¶ 86–96.) To state a claim of common-law fraud under New Jersey law, a plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997). The heightened pleading requirements of Rule 9(b) apply. *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 532 (D.N.J. 2011).

CVS asserts that the fraud claim should be dismissed because Prestige cannot satisfy the first, third, or fourth elements. (Br. pp. 13–19.) I find that those elements are adequately pled.

As to the first element, CVS asserts that it did not make any statements, false or otherwise, but merely afforded Prestige access to its online vendor portal. (Br. p. 15.) To the contrary, the Complaint alleges that CVS made false statements to Prestige *via* the online vendor portal. According to the Complaint,

---

claim for "book account/account stated" (Compl. ¶¶ 118–20), which CVS does not move to dismiss.

CVS "specifically designated" invoices as "Free for payment" on its online vendor portal—meaning "the amounts reflected had been approved for payment without further chargeback, holdback, credit or setoff"—and the portal reflected dates on which CVS would pay those invoices. (Compl. ¶¶ 39–41, 45–53.)

As to the third element, the Complaint states that CVS made misrepresentations "with the intent that Prestige rely thereon and continue to finance the parties' business relationship." (*Id.* ¶ 93.) The Complaint also states that CVS knew of the factoring relationship between BNI and Prestige, CVS worked with Prestige to afford it direct access to CVS's online vendor portal, and CVS was aware that "Prestige would log into CVS's vendor portal to review the balance due, and payment status of, the receivables due to Prestige from CVS." (*Id.* ¶¶ 34–35, 37.) At the pleading stage, those allegations are sufficient to generally allege knowledge and intent. *See* Fed. R. Civ. P. 9(b).

As to the fourth requirement, the Complaint alleges that Prestige relied on the information provided in CVS's online vendor portal. (Compl. ¶¶ 91–92, 94.) Whether that reliance was reasonable, as CVS contests in its motion to dismiss, "is a question of fact best reserved for the jury." *Goen Techs. Corp. v. NBTY, Inc.*, No. 05-cv-4597, 2007 WL 2595753, at *4 (D.N.J. Sept. 4, 2007) (citation omitted). The issue is inherently fact-bound: "A party reasonably relies on a misrepresentation" if "the facts to the contrary were not obvious or did not provide a warning," or where the relying party reasonably did not pursue further investigation that would have "revealed the falsity of the representation." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 305–06 (D.N.J. 2011) (internal quotation omitted). CVS asserts that Prestige should have known that CVS would apply approximately $3.23 million in discounts because it had applied discounts in the past ranging from about $65,000 to $75,000. (Br. p. 17.) However, the Complaint states that those lower discounts were already reflected on the invoices designated as "Free for payment." (Compl. ¶¶ 41, 47, 50, 53.) CVS is alleged to have applied $3.23 million in

discounts, orders of magnitude higher than those previously applied, only *after* designating the invoices as "Free for payment," (*id.* ¶¶ 60, 91–92). The fair warning issue is one of fact.

CVS also argues that Prestige did not reasonably rely on the information shown in the online vendor portal because it failed to investigate the invoices further to determine whether there were additional discounts to be applied. As mentioned above, however, CVS's argument rests on a factual conclusion that has not been reached—that the discounts applied to the accounts receivable were valid. Additionally, CVS argues that the court should rely on extraneous lawsuits involving the Boomer Defendants and businesses that are not parties to this litigation to dismiss Prestige's fraud claim. (*See* Br. pp. 18–19.) CVS fails to explain the relevance of those lawsuits to Prestige's claim of fraud against CVS.

Therefore, CVS's motion to dismiss Count Five of the Complaint is denied.

### F. Negligent Misrepresentation and Promissory Estoppel

Count Six of the Complaint asserts a claim of negligent misrepresentation and Count Seven asserts a claim of promissory estoppel against CVS. (Compl. ¶¶ 97–112.)

To establish a claim for negligent misrepresentation, a plaintiff must show that "(1) a false statement, (2) was negligently made, (3) plaintiff justifiably relied on that statement, and (4) suffered economic loss or injury because of the reliance." *Eberhart v. LG Elecs. USA, Inc.*, 188 F. Supp. 3d 401, 409 (D.N.J. 2016). To establish a claim for promissory estoppel, a plaintiff must show four elements: "(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that it will induce reliance by the promisee; (3) the promisee must reasonably rely upon the promise; and (4) the promisee must experience substantial reliance on the promise." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 439 (D.N.J. 1998), *aff'd*, 172 F.3d 859 (3d Cir.

15

1998); *see also Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 194 N.J. 223, 253 (2008).

CVS's motion to dismiss Counts Six and Seven concededly rests on many of the same contentions that it directed at Count Five (Br. pp. 19, 27): that CVS did not make any statement to Prestige, CVS did not intend for Prestige to rely on the information provided in the online vendor portal, and Prestige's reliance on that information was not justifiable. (Br. pp. 12–13, 19, 27–28.) Having found that those reasons present factual issues unsuitable for resolution on a motion to dismiss, *see* Section III.E., *supra*, I will also deny CVS's motion to dismiss the negligent misrepresentation and promissory estoppel claims (Counts Six and Seven).

### G. Unjust Enrichment

Count Ten of the Complaint asserts a claim for "quantum meruit/unjust enrichment." (Compl. ¶¶ 121–24.) Based on its briefing, Prestige appears to construe Count Ten as a claim for only unjust enrichment. (Opp. pp. 37–39.) Unjust enrichment is a "quasi-contract doctrine" that applies when a party "received a benefit and [] retention of that benefit without payment would be unjust." *Thieme v. Aucoin-Thieme*, 151 A.3d 545, 557 (N.J. 2016) (citations omitted). To state a claim for unjust enrichment under New Jersey law, a plaintiff must allege that "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *Arlandson v. Hartz Mt. Corp.*, 792 F. Supp. 2d 691, 711 (D.N.J. 2011) (internal quotation and citation omitted). New Jersey law requires a "direct relationship" between the plaintiff and defendant. *DeFrank v. Samsung Elecs. Am., Inc.*, No. 19-cv-21401, 2020 WL 6269277, at *23 (D.N.J. Oct. 26, 2020). What constitutes a sufficiently "direct relationship" to permit a finding of unjust enrichment will "depend heavily on facts of the individual case," with a key focus on whether the relationship "would create a reasonable expectation of benefit" between the parties. *Id.* (citation omitted). Furthermore, privity is not a requirement. *Id.* at *24.

CVS argues that Prestige did not perform any services for or confer any benefit on CVS; rather, any services or benefits were provided to BNI. (Br. pp. 28-29.) I find, however, that Prestige has sufficiently alleged a relationship with CVS that would give rise to a "reasonable expectation of benefit." *See DeFrank*, 2020 WL 6269277, at *23. Prestige alleges that, at all relevant times, CVS was fully aware of its factoring relationship with BNI. (Compl. ¶ 4.) CVS is alleged to have actively established Prestige as a vendor in its accounts payable system and, for almost a full year, paid over $32 million directly to Prestige on account of BNI's face mask sales. (*Id.* ¶¶ 4, 33-34, 38.) Prestige asserts that CVS received a benefit because, by Prestige purchasing BNI's receivables, BNI was able to finance the upfront cost of providing the face masks to CVS, which in turn was able to resell the product or use the product internally. (Compl. ¶ 123.) Under those facts, Prestige has alleged that CVS could reasonably expect a benefit from Prestige's purchase of the CVS accounts receivable sufficient to withstand the motion to dismiss.

CVS unpersuasively characterizes that benefit as "speculative," citing to *National Amusements, Inc. v. New Jersey Turnpike Authority*, 619 A.2d 262 (N.J. Super. Ct. Law Div. 1992), *aff'd*, 645 A.2d 1194 (N.J. Super. Ct. App. Div. 1994). That plaintiff planned to construct a movie theater on his then-undeveloped property, which bordered the New Jersey Turnpike. 619 A.2d at 263. The New Jersey Turnpike Authority, however, planned to widen the highway and, in order to do so, expected to purchase part of the plaintiff's land. *Id.* at 263–64. The Turnpike Authority notified the plaintiff of its intention and insisted that the plaintiff refrain from the planned construction until the widening project was finalized to prevent the plaintiff from inflating the value of the property. *Id.* Five years later, the Turnpike Authority notified the plaintiff that it would not need to condemn any portion of his property to complete the widening project. *Id.* at 264. The plaintiff then sued the Turnpike Authority for, among other things, unjust enrichment. *Id.* at 267. The plaintiff asserted that the Turnpike Authority was unjustly enriched during that five-year period by

the "hypothetical savings" it "would realize in the future" if it condemned a portion of the plaintiff's property in an unimproved state. *Id.* The New Jersey Superior Court disagreed. *Id.* The court concluded that the damages alleged were too speculative and ambiguous to warrant a remedy in damages because the Turnpike Authority never purchased the plaintiff's property, nor derived any benefit from it. *Id.*

Here, the alleged benefit is not a hypothetical future benefit. Rather, the Complaint alleges that, for almost a full year, CVS purchased face masks from BNI, Prestige funded BNI's manufacturing of the face masks, BNI provided the face masks to CVS, and CVS paid Prestige for the face masks. (Compl. ¶¶ 3–5, 32, 38.) The relationship was well established, and CVS is alleged to have been, at all relevant times, aware of Prestige's factoring relationship with BNI. (Compl. ¶ 4.) The benefit that was lost as a result of CVS's decision that it would not pay certain outstanding receivables is not so speculative to warrant dismissal of the unjust enrichment claim.

CVS also argues that any enrichment was not "unjust" because it routinely discounted other invoices on the vendor portal. (Br. p. 27.) I will not dismiss Count Ten on this basis. As I explained above, those lower discounts were already reflected on the invoices designated as "Free for payment," while the $3.23 million in discounts were applied *after* such designation. And this contention injects factual issues that the court cannot resolve on a motion to dismiss. *See* Section III.E., *supra*.

Therefore, CVS's motion to dismiss Count Ten of the Complaint is denied.

### H. Breach of the Implied Covenant of Good Faith and Fair Dealing

Count Four of the Complaint asserts a claim for breach of the implied covenant of good faith and fair dealing. (Compl. ¶¶ 80–85.) Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing. *See Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997). "[T]he breach of the implied covenant arises when the other party *has acted consistent*

18

*with the contract's literal terms*, but has done so in such a manner so as to 'have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Wade v. Kessler Institute*, 798 A.2d 1251, 1262 (N.J. 2002) (quoting *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 352 (N.J. 1976)) (emphasis added). "No claim for a breach of the covenant of good faith and fair dealing may lie, however, unless the underlying conduct is distinct from that alleged in a corresponding breach of contract claim." *MZL Cap. Holdings, Inc v. TD Bank, N.A.*, 734 F. App'x 101, 106 (3d Cir. 2018).

Prestige's breach of the implied covenant of good faith and fair dealing is, to be sure, based on the same underlying facts as its breach of contract claim. Still, it is not implausible that "certain credits, discounts, chargebacks and/or offsets against the balance due and owing to Prestige" might not literally violate the contract, but nevertheless be applied in bad faith. (*See* Compl. ¶ 78; Compl. ¶ 82 (same)). Those allegations might turn out to be a poor match for the factual record as it develops, and Prestige might be forced to elect its theories at some point. For now, however, I will permit this theory to be pled in the alternative. CVS's motion to dismiss Count Four of the Complaint is therefore denied.

### I. Tortious Interference

Count Eight of the Complaint asserts a claim for tortious interference with contractual relations and economic advantage against CVS. (Compl. ¶¶ 113–17.) In its briefing, Prestige appears to construe Count Eight as a claim for only tortious interference with contractual relations. (Opp. pp. 27–31.)

Under New Jersey law, a claim of tortious interference requires a showing of "(1) intentional and malicious interference (without justification); (2) with a prospective or existing economic or contractual relationship with a third party; (3) causing the loss of prospective gain; and (4) damages." *Angrisani v. Cap. Access Network, Inc.*, 175 F. App'x 554, 557 (3d Cir. 2006) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31 (N.J. 1989)); *See also ThermoLife Int'l LLC v. Connors*, No. 13-4399, 2014 WL 1050789, at *3

(D.N.J. Mar. 17, 2014) ("[T]he elements of a claim for tortious interference with a contractual relationship are (a) the existence of a contract, (b) intentional interference, with malice, (c) loss of the contract, and (d) damages."). An action for tortious interference with contract protects "parties to an existing . . . contractual relationship from outside interference." *Printing Mart–Morristown*, 563 A.2d at 38.

The New Jersey Supreme Court has explained that "the general rule defining the elements of tortious interference with an existing contract is:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person *by inducing or otherwise causing the third person not to perform the contract*, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Nostrame v. Santiago*, 61 A.3d 893, 901 (N.J. 2013) (emphasis added).

The Complaint straightforwardly alleges that there was a factoring agreement between Prestige and BNI and that BNI breached that factoring agreement by failing to pay the outstanding accounts receivable. (Compl. ¶¶ 16–22, 61–68.) The Complaint also asserts, however, that CVS was to blame for the breach: *i.e.*, that it tortiously interfered with Prestige and BNI's factoring agreement by improperly applying credits to, and ultimately failing to pay, the outstanding accounts receivable. (*Id.* ¶¶ 60, 115.) The Complaint, however, fails to allege that CVS, by applying those credits and failing to pay the accounts receivable, somehow induced BNI to breach its agreement with Prestige or otherwise interfered with BNI's performance under the contract. *See Nostrame*, 61 A.3d at 901. Rather, it appears that CVS, rightly or wrongly, acted in pursuit of its own contractual interests, and not as a malicious interloper in violation of the rules of the commercial game. Therefore, CVS's motion to dismiss Count Eight of the Complaint is granted. This dismissal, however, is without prejudice to further amendment.

IV.     **CONCLUSION**

CVS's motion to dismiss the Complaint is **GRANTED** in part and **DENIED** in part. Count Eight of the Complaint is dismissed without prejudice to the filing of a motion to amend, accompanied by a proposed amended complaint, within 30 days. The motion is otherwise denied. A separate order will issue.

Dated: December 22, 2022

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**